683 S.E.2d 803

**Larry Lee FESMIRE, Jr., and Teresa M. Fesmire, Respondents,**

v.

**George B. DIGH, Appellant.**

**No. 4549.**

Court of Appeals of South Carolina.

Heard Feb. 19, 2009.

Decided May 20, 2009.

298

J. Dwight Hudson and Mary Anne Graham, both of Myrtle Beach, for Appellant.

Otis Allen Jeffcoat, III, of Myrtle Beach, Ezizze Davis Foxworth, of Loris, and James B. Richardson, Jr., of Columbia, for Respondents.

GEATHERS, J.

This is an appeal from an order granting specific perform-
ance of an alleged oral contract for the sale of Appellant
George Digh's interest in a condominium to Respondents
Larry Fesmire, Jr., and Teresa Fesmire. We reverse the
master's order and remand the case for an accounting and
partition by sale.

## FACTS/PROCEDURAL HISTORY

In 1990, the parties to this action, along with Shelley Digh,
jointly purchased a Myrtle Beach condominium from Shelley's
employer, B.W. Miller. Shelley, who is now deceased, was the
wife of George Digh. The two couples were longtime friends
who took trips together. They executed a promissory note to
Miller in the amount of $85,000 and a mortgage on the
property to secure the note. They also entered into a written
agreement among themselves setting forth their understand-
ing of their respective ownership interests in the property, the
division of the property's income and expenses, and the dispo-
sition of their respective interests in the property in the event
of a future sale. They intended to use the condominium as
rental property and also for their occasional personal use.

Shelley, who was an accountant, kept the financial records
on the property. From July 1990 through April 1996, she sent
mortgage payments to Miller. On a quarterly basis, she
determined the amount of income collected and total expenses
for the property and notified Larry Fesmire if any funds were
due from him at that time.

In February 1994, Shelley was diagnosed with acute mye-
loblastic leukemia. From that point forward, the Dighs' per-
sonal use of the condominium significantly diminished. The
leukemia went into remission, and Shelley had a bone marrow
transplant; but in January 1996, the Dighs learned that the
leukemia had returned. When they were about to exhaust
health insurance coverage for Shelley's medical expenses, the
Dighs learned that they would have to raise $250,000 for a
second bone marrow transplant. Among their options for
fund-raising was a proposal for the Fesmires to purchase the
Dighs' interest in the Myrtle Beach condominium. George
Digh's understanding of the proposal was that both couples

would agree on a value of $140,000 for the condominium, with $70,000 attributable to each couple's interest in the property, provided that the sale closed within thirty days. According to George, the Dighs wanted to impose a thirty-day deadline because time was of the essence in raising funds for the bone marrow transplant. George understood that the amount due, after subtracting the Fesmires' share of the existing debt on the property, was approximately $37,000. However, no formal closing ever occurred.

According to Larry Fesmire, the proposal that Shelley submitted to him was for a net amount due of $20,000 for the Dighs' interest in the property. Larry Fesmire's account of events includes his payment of $20,000 in cash to Shelley during a visit to the Dighs' home in April 1996. He allegedly used a cigar box to carry the $20,000 in $100 denominations to Shelley's bedroom where she was lying ill, and he allegedly placed the box on Shelley's dresser.

Shelley's last mortgage payment was the April 1996 payment. In May 1996, the Fesmires took over the mortgage payments and started paying for all of the other expenses associated with the property. In July 1996, Shelley died.

In April 1998, George Digh wrote a letter to Larry Fesmire indicating his impression that Fesmire had never completed the purchase of Digh's interest in the Myrtle Beach condominium. Digh expressed his desire for Fesmire to complete the purchase of his interest or for the condominium to be placed on the market for sale. A few days later, Fesmire responded to the letter with two alternative proposals: (1) complete the "original agreement of March 1996" by paying what Fesmire considered to be the balance due on the net purchase price—$70,000 less the $20,000 "down payment paid in March of 1996," less Fesmire's share of the debt on the property as of March 1996 ($33,000), for a net amount due of $17,000; or (2) place the condominium on the market. Fesmire indicated his preference for the option of buying out Digh's interest. Digh responded with confusion over Fesmire's mention of a $20,000 payment.

The parties engaged in several unsuccessful efforts to resolve the matter, and the Fesmires eventually stopped making the mortgage payments on the Myrtle Beach condominium;

therefore, Digh had to take up payments on the mortgage to prevent foreclosure.[1] The Fesmires later filed an action against Digh seeking specific performance of an alleged oral contract for the sale of the Dighs' interest in the condominium for $20,000. The Fesmires alleged that before Shelley's death, they had entered into an oral contract with George and Shelley Digh for the sale of the Dighs' interest in the condominium. The complaint also requested the alternative remedies of a partition and sale of the property and an accounting. Digh filed a counterclaim seeking damages for conversion and seeking an accounting. The matter was referred to the master-in-equity, who conducted a bench trial and later issued an order granting specific performance of the alleged oral contract. Digh filed a motion for reconsideration, but the master denied the motion. This appeal followed.

## ISSUES ON APPEAL

I. Did the master err in admitting into evidence redacted versions of two letters authored by counsel for the purpose of settlement negotiations?

II. Did the master err in granting specific performance of the alleged oral contract in violation of the Statute of Frauds, S.C.Code Ann. § 32–3–10(4) (2007)?

III. Did the master err in failing to grant the parties' requests for a partition and an accounting?

## STANDARD OF REVIEW

██ This Court reviews all questions of law de novo. *E.g., Fields v. J. Haynes Waters Builders, Inc.,* 376 S.C. 545, 564, 658 S.E.2d 80, 90 (2008). Review of the trial court's factual findings, however, depends on the whether the underlying action is an action at law or an action in equity. *See Townes Assocs. Ltd. v. City of Greenville,* 266 S.C. 81, 85–86, 221 S.E.2d 773, 775–76 (1976) (setting forth standards of review to apply in actions at law and actions in equity).

---

1. Larry Fesmire testified that he abandoned the mortgage payments so that the property would go into foreclosure and he could then buy the property at a foreclosure sale.

In an action at law, the trial court's factual findings will not be disturbed upon appeal unless found to be without evidence which reasonably supports the trial court's findings. *Townes*, 266 S.C. at 86, 221 S.E.2d at 775. In an action in equity, the appellate court may resolve questions of fact in accordance with its own view of the preponderance of the evidence. *See Wilder Corp. v. Wilke*, 324 S.C. 570, 577, 479 S.E.2d 510, 513 (Ct.App.1996) (citing *Townes*, 266 S.C. at 86, 221 S.E.2d at 775) (holding that because the master-in-equity heard the action, which was equitable in nature, without appeal to the circuit court, the appellate court could find the facts on appeal in accordance with its own view of the preponderance of the evidence). However, this broad scope of review does not require this Court to disregard the findings at trial or to ignore the fact that the master was in a better position to assess the credibility of the witnesses. *Laughon v. O'Braitis*, 360 S.C. 520, 524–25, 602 S.E.2d 108, 111 (Ct.App. 2004).

To determine whether an action is legal or equitable, this Court must look to the action's main purpose as reflected by the nature of the pleadings, evidence, and character of the relief sought. *Ex parte Wheeler v. Estate of Green*, 381 S.C. 548, 673 S.E.2d 836, 839 (Ct.App.2009). Here, the Fesmires have asserted causes of action for specific performance of an alleged oral contract, a partition, and an accounting.[2] Our appellate courts have traditionally viewed the main purpose of each of these causes of action as the pursuit of equitable relief and thus have found these causes of action to be equitable in nature. *See Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290–91 (2000) (applying the equitable standard of review to the trial court's findings of fact in a specific performance action); *Lowcountry Open Land Trust v. Charleston S. Univ.*, 376 S.C. 399, 406, 656 S.E.2d 775, 779 (Ct.App.2008) (holding that an action for specific performance lies in equity); *Laughon*, 360 S.C. at 524, 602 S.E.2d at 110 (holding that a partition action as well as an action for accounting is an action in equity); *Settlemeyer v. McCluney*, 359 S.C. 317, 320, 596 S.E.2d 514, 516 (Ct.App.2004) (applying equitable standard of

---

2. Digh has asserted counterclaims for conversion, breach of contract, and an accounting. However, there are no issues on appeal involving Digh's conversion and breach of contract claims.

review to action for specific performance of an alleged oral contract for the conveyance of land); *Parker v. Shecut*, 340 S.C. 460, 478, 531 S.E.2d 546, 556 (Ct.App.2000), *rev'd on other grounds*, 349 S.C. 226, 562 S.E.2d 620 (2002), (holding that an action for specific performance lies in equity). Therefore, this Court may review the factual findings in the instant case in accordance with its own view of the preponderance of the evidence.

This case is distinguishable from *McGill v. Moore*, 381 S.C. 179, 672 S.E.2d 571 (2009), in which our Supreme Court applied the legal standard of review to the trial court's findings of fact in an action for specific performance of three written contracts for the sale of land. Because the contracts were in writing, their existence was not in dispute and the statute of frauds was not raised as a defense. Rather, before determining the suitability of specific performance as a remedy, the Court was required to **interpret** the **written provisions** of the contracts. Therefore, the Court determined that the action was an **action to construe a contract** and that such an action was an action at law. *Id.* at 185, 672 S.E.2d at 574. Here, Digh disputed the very existence of a contract with the specific terms asserted by the Fesmires, and he raised the statute of frauds as a defense. Therefore, the instant action cannot be construed as an action to construe a contract.

Rather, the circumstances of the instant action are virtually identical to those in *Settlemeyer*, which involved an action for specific performance of an alleged oral contract for the conveyance of land. In its opinion in *Settlemeyer*, this Court set forth the standard of review as follows: "In an action in equity, tried by the judge alone[ ] ... this Court has jurisdiction to find facts in accordance with its views of the preponderance of the evidence." *Settlemeyer*, 359 S.C. at 320, 596 S.E.2d at 516.

As in the instant case, the plaintiff in *Settlemeyer* alleged that his part performance of the alleged oral contract removed it from the statute of frauds. The Court treated the existence of the alleged oral contract as a question of fact rather than a question of law and stated, "Based on **our review of the evidence** contained in the record, we hold *Settlemeyer* did not present clear evidence of an oral agreement between the

parties." *Id.* at 321, 596 S.E.2d at 516 (emphasis added). The Court cited *Gibson v. Hrysikos,* 293 S.C. 8, 13–14, 358 S.E.2d 173, 176 (Ct.App.1987) for the proposition that a court must find, among other things, clear evidence of the existence of an oral agreement for part performance to remove the contract from the statute of frauds. *Id.* Likewise, in the instant case, this Court's review of the master's factual findings on the existence of a contract, with the terms asserted by the Fesmires, is governed by this Court's own view of the evidence.[3]

## LAW/ANALYSIS

### I. *Redacted Letters*

■ At trial, Fesmire introduced into evidence redacted versions of two letters written by the parties' attorneys during settlement negotiations. Digh argues that the master erred in admitting these letters into evidence because their introduction violates Rule 408, SCRE, which prohibits the introduction of statements made in compromise negotiations. Digh also argues that the master exacerbated the prejudice to him by allowing Fesmire to redact most of the contents of the letters because the redaction resulted in a false interpretation of statements taken out of context. We agree.

Plaintiffs Exhibit # 16 is a redacted version of a letter dated June 18, 2001, authored by Digh's former counsel and addressed to Larry Fesmire. The redacted version presented to the master reads as follows:

Dear Mr. Fesmire:

. . . .

$20,000.00 previously given to Digh from Fesmire.

However, the unredacted version of the letter clearly indicates that the isolated phrase presented in the redacted version was an assumption made for the purpose of negotiating a settlement of the terms of a buyout and that it was inextricably linked to the offer of settlement. Notably, the following words appeared at the top of the letter: *"FOR SETTLEMENT PURPOSES ONLY."* Further, the isolated phrase in the redacted version was prefaced by the following language:

---

3. During oral arguments, counsel for the parties agreed that an equitable standard of review is proper.

[W]e would offer the following settlement:

. . .

OUT of Dighs [sic] $92,000.00 we will subtract the following reimbursements to Fesmire:

Moreover, the letter also states the following:

Please note that I have used the numbers you gave me as to the expenses being deducted from Mr. Digh. If this matter can not [sic] be settled as stated, I will need proof of payments, mortgage history, tax returns for 1996—2000 and Homeowner Association invoices etc.

Plaintiffs Exhibit # 17 is the redacted version of a second letter dated August 23, 2001, also authored by Digh's former counsel and addressed to Larry Fesmire. The redacted version presented to the master reads as follows:

Dear Mr. Fesmire:

Please be advised that Forquer & Green does indeed represent the interest of Mr. George Digh in the above-referenced matter.

. . .

$20,000.00 previously given to Digh from Fesmire.

Please note that if this matter is not settled, Digh will contest that the $20,000.00 was to be applied to this transaction.

However, the unredacted version of the letter indicates that the isolated phrases presented in the redacted version were assumptions made for the purpose of negotiating a settlement and that they were inextricably linked to the offer of settlement. The isolated phrases in the redacted version were prefaced by the following language:

I have reviewed the information you sent me in response to the initial proposal and have incorporated your numbers into my calculations.

. . .

Following the June 18th letter format out of Dighs [sic] $86,500.00 we will subtract the following reimbursements to Fesmire:

Once again, the settlement letter also states the following:

[P]lease note this is Mr. Digh's final attempt to settle this matter. If this should fail, I will have no choice but to

follow Mr. Digh's instructions and file a Partition Action at which time I will be requesting many financial documents from you....

Clearly, in both letters, the request of Digh's attorney for documentary proof of Fesmire's financial contributions to the property, including the alleged $20,000 payment for the Dighs' interest in the property, indicated that the statements made in the letters were assumptions for settlement purposes only.

The master concluded that the redacted versions of these letters were admissible because they were admissions of fact and therefore were not privileged as statements made in connection with settlement negotiations. The master also set forth the following additional grounds for the admissibility of the redacted letters: (1) the material did not constitute hearsay because it was not offered for the truth of the matter asserted; (2) the material was not hearsay because it qualified as an admission of a party-opponent; and (3) the material qualified as a prior inconsistent statement of a witness under Rule 613(b), SCRE. The master then concluded that the letters could be used to (1) impeach Digh's testimony that he did not know about Fesmire's alleged payment of $20,000; and (2) satisfy the writing requirement of the Statute of Frauds.

Rule 408, SCRE provides as follows:

**Evidence** of (1) furnishing or offering or promising to furnish, or (2) accepting or **offering or promising** to accept, a valuable **consideration** in compromising or attempting **to compromise** a claim which was disputed as to either validity or amount, **is not admissible to prove liability** for or invalidity of the claim or its amount. **Evidence of conduct or statements made in compromise negotiations is likewise not admissible.** This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(emphasis added).

This rule contemplates that the parties need to feel free to make certain assumptions for the purpose of settle-

ment negotiations and that those statements are assumed by the author to be true only for the purpose of compromise negotiations. The rule codifies the longstanding principle that evidence of conduct or statements made in compromise negotiations is not admissible. *See QHG of Lake City, Inc. v. McCutcheon*, 360 S.C. 196, 209, 600 S.E.2d 105, 111 (Ct.App. 2004) ("Because the law favors compromises, our appellate courts have long held that testimony as to negotiations and offers to compromise are inadmissible for proving liability."); *Commerce Ctr. of Greenville, Inc. v. W. Powers McElveen & Assocs., Inc.*, 347 S.C. 545, 558, 556 S.E.2d 718, 725 (Ct.App. 2001) ("The courts favor compromise; accordingly, evidence relating to settlements is generally not admissible to prove liability."); *Hunter v. Hyder*, 236 S.C. 378, 387, 114 S.E.2d 493, 497 (1960) ("[C]ompromises are favored and evidence of an offer or attempt to compromise or settle a matter in dispute cannot be given in evidence against the party by whom such offer or attempt was made.").

The statements highlighted in the redacted versions of the settlement letters admitted into evidence in this case were undoubtedly "statements made in compromise negotiations." When these respective statements are viewed in the context of the unredacted version of the letters, it is clear that the references to the alleged $20,000 payment were assumptions made for purposes of negotiating a compromise settlement. The references were inextricably linked to the offer of settlement.

Further, the master's citation to *McCormick on Evidence* in Conclusion of Law # 6 is incomplete. In this conclusion, the master cites the treatise for the proposition that an admission of fact in the course of negotiations is not privileged. However, the McCormick treatise significantly qualifies that proposition. 2 *McCormick on Evidence* § 266 (6th ed. 2006) (discussing the trend to extend the protection to all statements made in compromise negotiations and discouraging the use of inconsistent statements made in compromise negotiations for general impeachment of the testimony). Therefore, the master's reliance on this treatise excerpt to support the admission of the redacted settlement letters into evidence is misplaced.

In fact, the master's use of the redacted letters exhibits the very danger highlighted in the McCormick treatise because it constitutes a misuse of allegedly "prior inconsistent statements" to prove liability.[4] The master's order uses the material from the redacted letters under the guise of impeachment of Digh's credibility to bolster Fesmire's version of the parties' contract. Therefore, the admission of these letters into evidence violated Rule 408, SCRE, as they were offered in compromise negotiations.

■■ Additionally, regardless of whether the master used the redacted letters for impeachment purposes or to satisfy the writing requirement of the Statute of Frauds, the statements in the letters were undoubtedly offered for the truth of the matter asserted because they were offered to show that Larry Fesmire paid $20,000 to the Dighs for their interest in the condominium. Further, the statements in the settlement letters were not admissions of a party-opponent because they were assumptions made for the purpose of negotiating a compromise settlement. Therefore, contrary to the master's conclusion, the disputed material constituted inadmissible hearsay. See Rule 802, SCRE.

Moreover, the admission of the redacted letters into evidence clearly prejudiced Digh because the master used this evidence to support his conclusion that the alleged oral contract asserted by the Fesmires satisfied the Statute of Frauds. This undoubtedly affected the outcome of the case.

---

4. Notably, the federal rule's prohibition against using evidence of settlement negotiations for impeachment through a prior inconsistent statement is explicit Rule 408, FRE, provides as follows:

(a) **Prohibited uses.—Evidence of the following is not admissible** on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, **or to impeach through a prior inconsistent statement or contradiction:**
(1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and
(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.
(emphasis added).

310

Based on the foregoing, the master committed prejudicial error in admitting the redacted settlement letters into evidence.

## II. *Specific Performance*

■ Digh argues that the master erred in granting specific performance of the alleged oral contract because the Fesmires' action is barred by the Statute of Frauds, S.C.Code Ann. § 32–3–10(4) (2007). We agree.

■ Specific performance should be granted only if there is no adequate remedy at law and specific enforcement of the contract is equitable between the parties. *Ingram*, 340 S.C. at 105–06, 531 S.E.2d at 291. Here, the master concluded that the settlement correspondence of Digh's counsel was sufficient to satisfy the writing requirement of the Statute of Frauds. In the alternative, the master concluded that even if there was not a writing that was sufficient to satisfy the Statute of Frauds, the Fesmires' part performance of the contract took it out of the purview of the Statute of Frauds. Digh argues that the master erred in making these conclusions. We agree.

The Statute of Frauds provides, in pertinent part, as follows:

No action shall be brought whereby:

. . .

(4) To charge any person upon any contract or sale of lands, tenements or hereditaments or any interest in or concerning them . . .

Unless the agreement upon which such action shall be brought or some **memorandum** or **note** thereof **shall be in writing** and signed by the party to be charged therewith or some person thereunto by him lawfully authorized.

S.C.Code Ann. § 32–3–10(4) (2007) (emphasis added).

### A. *Settlement correspondence*

The settlement correspondence of Digh's counsel could not satisfy the writing requirement of the Statute of Frauds because the very admission of those letters into evidence violated Rule 408, SCRE, which prohibits the admission of statements made in compromise negotiations, and violated

Rule 802, SCRE, which generally prohibits the admission of hearsay evidence.

## B. *Part Performance*

 Further, when there is no writing, but part performance is alleged to remove an oral contract from the Statute of Frauds, a court of equity must find the following factors before it may compel specific performance of the oral contract: 1) clear evidence of an oral contract; 2) the contract had been partially executed; and 3) the party who requested performance had completed or was willing to complete his part of the oral contract. *Settlemeyer*, 359 S.C. at 320, 596 S.E.2d at 516. In *Scurry v. Edwards*, 232 S.C. 53, 61, 100 S.E.2d 812, 816–17 (1957), the Court explained the nature of the part performance exception to the Statute of Frauds:

> [T]he courts [will] require specific performance of an oral contract for the conveyance of land, where the terms of the contract are clear, definite and certain and are established by competent and satisfactory proof, and where the party seeking to rescue it from the statute shows such acts of performance or part performance on his part, **clearly and unequivocally referable to such agreement,** as would render application of the statute unconscionable. **Payment of the purchase price in whole or part is not of itself regarded as such part performance** as will take the contract out of the statute and the fact that no part of the purchase price has been paid does not necessarily require application of the statute. **Mere change of possession is not necessarily sufficient to avoid the consequences of the statute;** like payment of the purchase price, it is a fact to be considered in connection with the other facts and circumstances of the transaction in determining whether or not there has been such performance or part performance as warrants relief from the statute. Likewise, the fact that improvements have been made on the property after possession, while strong evidence of part performance, is neither conclusive of that issue nor indispensable proof of it.

*Scurry,* 232 S.C. at 61, 100 S.E.2d at 816–17 (internal citations omitted) (emphasis added).

### 1. *No clear evidence*

Initially, there is no clear evidence of a contract with the specific terms asserted by the Fesmires. Therefore, specific performance is not an appropriate remedy because the Fesmires have not satisfied the first prong of the part performance exception to the Statute of Frauds. *See Settlemeyer*, 359 S.C. at 320, 596 S.E.2d at 516 (holding that to compel specific performance of an oral agreement where part performance is alleged to remove the contract from the Statute of Frauds, a court of equity must find: 1) clear evidence of an oral agreement; 2) the agreement had been partially executed; and 3) the party who requested performance had completed or was willing to complete his part of the oral agreement).

The testimony concerning the terms of the alleged oral contract was very contradictory, and the Fesmires' evidence of the existence of a contract with the specific terms asserted by them rested on the following questionable evidence: (1) improperly admitted statements taken out of the context of settlement negotiations; and (2) the self-serving testimony of Larry Fesmire regarding alleged statements of Shelley Digh, a woman who died before the Fesmires brought this action. Assuming, without deciding, that the Dead Man's Statute, S.C.Code Ann. § 19–11–20 (1985), did not render Fesmire incompetent to testify as to any transaction with Shelley Digh, this statute addresses merely the competency of the witness and not the weight that should be given to such testimony in any particular case. Here, we view the testimony as suspect and do not accord it much weight.

In sum, the Fesmires have not satisfied the first prong of the standard for compelling specific performance where part performance is alleged to remove an oral agreement from the Statute of Frauds because they have not presented clear evidence of an oral agreement.

### 2. *No partial execution*

As to the second prong of the standard for compelling specific performance where part performance is alleged to remove an oral agreement from the Statute of Frauds, the evidence does not indicate that the Fesmires partially executed the alleged agreement. There is no clear evidence that the

Fesmires paid $20,000 to the Dighs.[5] Further, the Fesmires' mortgage payments, possession of the condominium, and any alleged improvements to the condominium were not necessarily indicators of part performance because their existing partial ownership interest in the condominium already provided them with a reason to take those actions. *See Scurry*, 232 S.C. at 61, 100 S.E.2d at 816–17 (requiring that the party seeking to rescue an alleged oral contract from the Statute of Frauds show such acts of performance or part performance that are "clearly and unequivocally referable to such agreement" and that would render application of the statute unconscionable).

Moreover, these actions could have been consistent with Digh's version of the parties' contract and subsequent events, despite the expiration of the thirty-day deadline for closing the sale.[6] Therefore, these actions are not probative of the specific contract terms alleged by the Fesmires.

### 3. *No evidence of willingness to complete*

The Fesmires also failed to satisfy the third prong of the standard for compelling specific performance where part performance is alleged to remove an oral agreement from the Statute of Frauds because the evidence does not indicate that Larry Fesmire was willing to complete his part of the alleged agreement. He stopped making mortgage payments in July 2002, forcing Digh to take over the mortgage payments and to pay off the balance of the debt secured by the mortgage. In fact, Larry Fesmire admitted that he abandoned the mortgage

---

5. The only evidence of the Fesmires' payment is Larry Fesmire's testimony that he took $20,000 in cash to Shelley Digh. Larry Fesmire's wife, who accompanied him on that visit, could not even corroborate this testimony. This testimony hardly rises to the level justifying specific performance. *See Pennington v. Pennington*, 89 S.C. 277, 279, 71 S.E. 825, 825(1911) (holding that in an action of specific performance of an alleged oral contract for the conveyance of land, the burden was on the plaintiffs to prove payment of the purchase money in full before they could ask that the defendant be required to convey).

6. Digh understood that the Fesmires were to pay the Dighs $37,000 to purchase their interest and that the closing was to take place within 30 days. Digh indicated in later correspondence that he was not aware of a $20,000 payment, and he testified that no closing ever took place. He also indicated that he continued to allow the Fesmires to make the mortgage payments because of their existing interest in the condominium.

payments so that he could purchase the property at a foreclosure sale. We find that Larry Fesmire's behavior is inconsistent with a good faith intent to complete his part of the alleged agreement.

Based on the foregoing, the master erred in granting specific performance of the alleged oral contract.

### III. *Partition and Accounting*

■ Digh argues that the master should have granted the parties' requests for a partition and accounting.[7] We agree.

The remedy of partition is provided in S.C.Code Ann. § 15–61–10 (2005):

> All joint tenants and tenants in common who hold, jointly or in common, for a term of life or years or of whom one has an estate for a term of life or years with the other that has an estate of inheritance or freehold in any lands, tenements or hereditaments shall be compellable to make severance and partition of all such lands, tenements and hereditaments.

Further, section 15–61–50 of the South Carolina Code (2005) provides for partition by sale when partition in kind is not practical:

> The court of common pleas has jurisdiction in all cases of real and personal estates held in joint tenancy or in common to make partition in kind or by allotment to one or more of the parties upon their accounting to the other parties in interest for their respective shares or, in case partition in kind or by allotment cannot be fairly and impartially made and without injury to any of the parties in interest, by the sale of the property and the division of the proceeds according to the rights of the parties.

■ "Ordinarily, partition is compellable among co-tenants as a matter of right . . . and is not suspended by an interest in

7. In their complaint, the Fesmires requested partition as an alternative remedy. Digh's answer stated that he agreed that the property should be partitioned but that the proceeds should not be distributed as suggested by the Fesmires. Digh also interposed a counterclaim for an accounting. Digh's motion to alter or amend the master's order included the argument that the master erred in failing to rule on the alternative remedy of a partition and that partition should be granted.

or a right to use the property." *Thompson v. Brunson*, 283 S.C. 221, 225, 321 S.E.2d 622, 624 (Ct.App.1984) (internal citations & quotations omitted).[8]

Here, the Fesmires did not clearly establish the specific terms of their alleged contract for the purchase of the Dighs' interest in the condominium. Because they did not satisfy the Statute of Frauds, specific performance was not an appropriate remedy. Further, the Fesmires requested partition as an alternative remedy and Digh also requested partition, a remedy to which the parties are entitled under sections 15–61–10 and –50.[9] Therefore, the master erred in failing to grant a partition and accounting.

## CONCLUSION

Accordingly, the master's order granting specific performance is **REVERSED** and the case is **REMANDED** to the master for an accounting and partition by sale.[10]

WILLIAMS and PIEPER, JJ., concur.

---

8. In *Smith v. Cutler*, 366 S.C. 546, 550, 623 S.E.2d 644, 647 (2005), our Supreme Court held that the deed in that case created a tenancy in common with a right of survivorship and that the survivorship rights between the tenants created true future interests in the entire estate that could not be destroyed by the unilateral act of one tenant through an act such as partition. Here, however, the language in the deed to the Dighs and the Fesmires does not indicate any special right of survivorship. The grantor conveyed the condominium to "George B. Digh, Shelley K. Digh, Larry L. Fesmire, Jr. and Teresa Fesmire, their heirs and assigns, forever...."

9. The parties' agreement as to their respective rights in the property does not conflict with the statutory remedy of partition. The agreement includes a right of first refusal provision: "In the event that one couple wishes to get out of this venture the other couple has the first right of refusal [sic] to purchase the other's interest for whatever the cash basis is in the property." The agreement also provides, "In the event of death of any of the four people, the remaining spouse can continue to own the ½ share unless she/he wishes to sell, where the remaining couple will have the first right of refusal [sic] and can purchase said interest for the cash basis in the property."

10. In view of our disposition of the foregoing issues, we decline to address Digh's remaining issues. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating

_____

that the appellate court need not review remaining issues when its
determination of a prior issue is dispositive of the appeal).